UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

JENNIFER ROSE ANTONAKIS,

        Plaintiff,

        v.                                      Case No. 14-C-1021

CAROLYN W. COLVIN
Acting Commissioner of Social Security,

        Defendant.

---

## DECISION AND ORDER

Jennifer Rose Antonakis appeals the denial of her application for Supplemental Security Income disability insurance benefits (DIB) and Supplemental Security Income (SSI). Antonakis applied for DIB on or about December 14, 2010, alleging an onset date of June 30, 2010. (*See* Tr. 154, 169.) She applied for SSI on or about January 6, 2011, alleging an onset date of September 18, 2010. (*See* Tr. 156.) Her claims for benefits were denied initially and upon reconsideration. Thereafter, an Administrative Law Judge (ALJ) conducted a hearing on January 15, 2013, at which Antonakis was represented by counsel. Antonakis and a vocational expert (VE) testified. On March 28, 2013, the ALJ denied both claims for benefits. On June 21, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1.)

Antonakis seeks judicial review pursuant to 42 U.S.C. § 405(g). The parties agree that Antonakis had to establish that she was disabled by June 30, 2010, (her "date last insured"), to obtain DIB.

Under § 405(g), "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." This court will overturn the

Commissioner's final decision only if it lacks support by substantial evidence, is grounded in legal error, or is too poorly articulated to permit meaningful review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Curvin v. Colvin*, 778 F.3d 645, 648 (7th Cir. 2015) (internal quotation marks omitted). The court views the record as a whole but does not reweigh the evidence or substitute its judgment for that of the ALJ. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). The ALJ is not required to address every piece of evidence or testimony presented, but must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect that examination. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

The Social Security Administration has adopted a sequential five-step process for determining whether a claimant is entitled to DIB. 20 C.F.R. §§ 404.1520.[1] Familiarity with the five-step process is presumed.

Here, the ALJ rejected Antonakis's DIB claim at step two. The ALJ found that the record did not establish any significant impairments as of June 30, 2010. (Tr. 20.)

Regarding the SSI claim, at step two the ALJ found that Antonakis had severe impairments of "low back disorder, status post lumbar interbody fusion at L5-C1 on

---

[1] As noted by the Commissioner, the relevant DIB and SSI regulations are virtually identical. (Doc. 20 at 3 n.1.) For convenience, the court will cite mainly to the DIB regulations found in 20 C.F.R. pt. 404 subpt. P, 20 C.F.R. § 404.1501 *et seq.* The parallel SSI regulations are found at 29 C.F.R. pt. 416 subpt. I, 20 C.F.R. § 416.901 *et seq.* (*See* Doc. 20 at 3 n.1.)

2

April 17, 2012, adjustment disorder, anxiety disorder, and personality disorder." (Tr. 21.) The ALJ then found that Antonakis had the residual functional capacity (RFC)

> to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a) except she can only occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. She is limited to the performance of simple, routine repetitive tasks requiring no more than simple work related decisions with toleration for no more than few changes in the routine work setting and no more than occasional interaction with supervisors, coworkers, and the general public. She is not able to perform at a production rate pace but can perform goal-oriented work.

(Tr. 28.) At step five the ALJ found in light of the VE's testimony, Antonakis could perform the jobs of

> bench work assembly/final assembly (DOT 713.687-018) with 2000 jobs in the regional economy, defined as the state of Wisconsin; product inspector/weight tester (DOT 539.485-010), with 400 jobs in the regional economy; and machine feeder/press operator (DOT 715.685-050), with 900 jobs in the regional economy.

(Tr. 31.) Thus, he found her not disabled for SSI purposes as well.

## ANALYSIS

A.   DIB Determination

As an initial matter, Antonakis does not appear to be challenging the ALJ's DIB determination at step two that she suffered from no severe impairment on or before her claimed onset date of June 30, 2010. Although Antonakis makes a step-two challenge on appeal, her factual statement and the evidence she cites reference only events and records of matters after June 30, 2010. (*See* Doc. 17 at 1-13.) Moreover, the evidence in the record from before the claimed onset date consists mainly of a few short medical records from early 2010 indicating that Antonakis suffered from stress and a possible pseudoseizure, was referred to a neurologist and psychiatrist, and had a normal EEG. (Tr.

3

231-32.) Because Antonakis bore the burden of establishing a severe impairment at step two and there is a lack of evidence supporting her DIB claim, the court finds that she has waived any challenge to the ALJ's DIB determination relating to the key date of June 30, 2010.

B.     SSI Determination

In many ways the ALJ provided a detailed, in-depth decision—more comprehensive than many decisions this court has reviewed recently. Nevertheless, the case must be remanded for reconsideration or further consideration of a few points regarding RFC at step five, highlighting how specific and time intensive reviews of these types of claims can be, especially when a claimant has a lengthy medical history and sizeable records. In all other respects, the ALJ's decision is affirmed.

1.     Step Two Challenge

Again, at step two, the ALJ found that Antonakis had the severe impairments of "low back disorder, status post lumbar interbody fusion at L5-S1 on April 17, 2012, adjustment disorder, anxiety disorder, and personality disorder." (Tr. 21.) He analyzed in great detail Antonakis's medical evidence. (Tr. 21-26.) The ALJ then explained why he found that Antonakis's migraine headaches, fibromyalgia, and various mental diagnoses were *not* severe impairments. (Tr. 26.)

Antonakis contends that the ALJ erred by failing to determine her credibility at step two. However, he was not required to do so. *See Curvin v. Colvin*, 778 F.3d 645, 648-49 (7th Cir. 2015). Step two is a threshold requirement for proceeding to later steps; as long as the ALJ determines that the claimant has one severe impairment, the ALJ proceeds to the remaining steps. *Id.* Credibility needs to be considered at step two only if no severe

4

impairment is found based on the objective medical evidence alone. *Id.* If the objective medical evidence is enough to establish a severe impairment, as it was in Antonakis's case, the ALJ need not address credibility at step two. *See id.* at 649.

Antonakis bases her argument on language in SSR 96-3p and SSR 96-7p. (Doc. 17 at 16-17.) The *Curvin* court rejected a similar argument based on the same SSRs. As *Curvin* issued two weeks *after* Antonakis filed her brief, she cannot be faulted for making the argument. However, *Curvin* resolves this issue against her.

    2.    RFC Challenges

        a.    Treating-Physician and Reviewing-Physician Evidence

Antonakis contends that the ALJ did not consider the opinions of treating physician Dr. James Williams properly and gave too much weight to the non-examining agency medical experts, Drs. George Walcott, Janis Byrd, Kenneth Clark, and Joan Kojis.

Generally, the Administration gives more weight to the medical opinion of a source who examined the claimant than the medical opinion of a source who did not. 20 C.F.R. § 404.1527(c)(1). Further, because of the unique perspective of and longitudinal picture from a treating physician, his or her opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *accord* SSR 96-2p; *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). "Controlling weight" means that the opinion is adopted. SSR 96. A treating physician's opinion may have several points; some may be given controlling weight while others may not. *Id.* An "ALJ can reject an examining physician's opinion only for reasons supported by substantial

5

evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470.

An ALJ's finding that a treating physician's opinion is not entitled to controlling weight "does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. In determining the weight to give a non-controlling treating physician's opinion, the ALJ must consider the length of the treatment relationship (more weight is given the longer a treating source has treated the claimant), the frequency of examination, the nature and extent of the treatment relationship (the more knowledge a treating source has the more weight is given), the physician's evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialty of the physician, and any other relevant factors. 20 C.F.R. § 404.1527(c)(2)-(6).

The ALJ must always give good reasons "sufficiently specific to make clear to any subsequent reviewers" the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel*, 345 F.3d at 470.

The weight given to nonexamining sources "will depend on the degree to which they provide supporting explanations for their opinions" and "the degree to which these opinions consider all of the pertinent evidence." 20 C.F.R. § 404.1527(c)(3). Generally, more weight is given to the opinion of a specialist regarding issues related to the area of specialty than to the opinion of a source who is not a specialist. § 404.1527(c)(5). If an ALJ asks for opinions of medical experts, those opinions are considered using these rules. § 404.1527(e)(2)(iii). However, the decision whether a claimant is disabled is reserved to the Commissioner. A statement by a medical source that a claimant is disabled is given

6

no special significance and does not mean that the Commissioner will determine the claimant to be disabled. § 404.1527(d).

At step two, the ALJ discussed in great detail the diagnostic testing and medical records supporting the finding that these conditions were severe. (Tr. 21-26.) In his reasoning respecting the existence of severe impairments, the ALJ relied on several records from treating physician Dr. Williams and included references to Dr. Williams's records regarding stable fibromyalgia; Antonakis's complaints of increasing migraine headaches and back pain; and diagnoses of trochanteric bursitis, migraine headaches, and chronic pain. (Tr. 22, 25.) The ALJ noted Dr. Williams's medical-source statement regarding Antonakis's limitations and physical abilities and a letter regarding her various conditions and diagnoses. (Tr. 25 (citing Exhibits 25F and 26F).) Also, after discussing other records from Dr. Williams and other treatment providers, the ALJ referenced Dr. Williams's letter, dated following the hearing before the ALJ, reporting that Antonakis had been prescribed a walker and cane, which were required for activities of daily living, and that all the fibromyalgia trigger points were positive. (Tr. 26 (citing Exhibit 34F).)

The ALJ then explained why he found that Antonakis's migraine headaches and fibromyalgia were *not* severe impairments:

> Additionally, the claimant has nonsevere impairments: migraine headaches, which have never been diagnosed clinically but with subjective complaints only; fibromyalgia, which has never been clinically diagnosed with trigger point testing or otherwise; and numerous mental diagnoses based on the claimant's subjective histories.
>
> With respect to the fibromyalgia, contrary to Dr. Williams'[s] statement in his letter on January 23, 2012 (Exhibit 34F), there is no contemporaneous evidence that the fibromyalgia trigger points have been tested and are positive. When this diagnosis was suggested in April 2011 (Exhibit 35F), the physician merely noted that the claimant should be referred to a neurologist

7

for workup and suggested that fibromyalgia be ruled out. He did not mention that the trigger points were positive . . . .

(Tr. 26.) The ALJ's decision must be read as a whole; an ALJ need not repeat his discussion of medical evidence in each section of the decision where it may be relevant. *See Curvin*, 778 F.3d at 650. Thus, the ALJ did not have to repeat his step-two comments and determinations regarding RFC. Therefore, the court will consider all of the ALJ's discussions of medical evidence—whether as to step two or specifically at the RFC stage—as applicable to the RFC determination.

In the RFC section of the decision, the ALJ discussed Dr. Williams's and the agency reviewing physicians' medical opinions as follows:

> As for the opinion evidence, little weight is accorded to the opinions of Dr. Williams in Exhibits 25F, 26F, and 34F. His diagnoses are not clinically established in the record, especially with regard to fibromyalgia and migraine headaches. These diagnoses are essentially refuted by the treating neurologist in Exhibit 6F. He observed on January 17, 2011, and February 10, 2011, that he did not believe that she had complex migraines. He thought some of her symptoms might be related to anxiety and noted a functional[2] aspect to her symptoms. He noted that she was resistant to any medical therapy. He made no mention of positive trigger points that would establish the diagnosis of fibromyalgia. Exhibit 34F was submitted after the hearing and says that trigger points are positive for fibromyalgia, but this is not demonstrated in any contemporaneous outpatient treatment records from Dr. Williams (See e.g. Exhibit 31F, notes from November 26, 2012, when he noted that the claimant felt dramatically better). Apparently Dr. Williams has now prescribed a cane and walker for the claimant, and she may have used such after her low back surgery in April 2012. There is no credible evidence that this need will last for 12 continuous months, from the date of the surgery, or from the date of Dr. Williams's opinion in Exhibit 34F.
>
> The undersigned accords some weight to the state agency medical professionals and mental health professionals in Exhibits 11F, 22F, 12F, and 21F. Those opinions are generally correct, although the residual functional

---

[2] "Functional" denotes "a disorder with no known or detectable organic basis to explain the symptoms." Stedman's Medical Dictionary 777 (28th ed. 2006).

8

capacity assessment made by the undersigned is more limiting with respect to the claimant's mental functioning.

(Tr. 30.) Thus, it appears that the ALJ used Dr. Williams's opinions in Exhibits 25F, 26F, and 34F as support for his step two finding regarding low-back pain but questioned and rejected them when discussing Antonakis's migraines, fibromyalgia, and need for a cane.

Exhibit 25F consists of a medical-source statement from June 2012 in which Dr. Williams identified Antonakis's diagnosis as including chronic back pain, fibromyalgia, and chronic extremity pain. (Tr. 650.) He opined on Antonakis's physical abilities, saying she could lift or carry less than ten pounds occasionally or frequently, could stand or walk less than two hours and needed an assistive device, could sit less than six hours and must alternate positions, and had severe limitations for pushing and pulling with upper and lower extremities.[3] (Tr. 650.) Dr. Williams added that Antonakis had additional limitations from the side effects of medication. (Tr. 650.)

Exhibit 26F consists of a letter dated June 19, 2012, to Antonakis's attorney stating that Dr. Williams viewed Antonakis as totally disabled on a permanent basis. In addition, Dr. Williams added that Antonakis was chronically ill, with chronic leg discomfort and problems since birth due to her clubbed feet; she had been diagnosed with fibromyalgia and had a history of complex migraines, left-sided hemiparesis, and leg weakness; that she had a recent spinal fusion; and that she was on multiple medications with a significant need for at home assistance with activities of daily living. (Tr. 651.) Exhibit 34F was a letter dated January 23, 2013—about one week after the ALJ's hearing in Antonakis's

---

[3] At the hearing, the VE testified that none of the jobs the ALJ found at step five would be available to a person who could occasionally or frequently lift only less than ten pounds and stand or walk less than two hours in a workday. (Tr. 82-83.)

9

case—indicating that Antonakis needed a walker and cane and that all of the fibromyalgia trigger points were positive and Antonakis "clearly has the diagnosis." (Tr. 650-51, 718.)

As for RFC, the ALJ addressed only the opinions on migraines, fibromyalgia, and use of a cane. He did not discuss the weight given to Dr. Williams's assessments in Exhibit 25F concerning Antonakis's time limitations for standing, walking and sitting and severe limitations on pushing and pulling. Yet the ALJ rejected those limitations, as the VE stated that standing and walking limitations could result in no available jobs. Thus, the ALJ did not provide a logical bridge to his rejection of those opinions. Nor did the ALJ discuss whether Dr. Williams's assessments in the three noted exhibits were consistent with Dr. Williams's medical opinions in treatment records. The treatment records contain many references to fibromyalgia and migraines—these were not new conditions first mentioned in these three exhibits. Nor did the ALJ discuss the medical assessments in the treatment records regarding chronic leg pain and weakness. Also, the ALJ did not mention whether he was giving any of the opinions noted in the treatment records controlling weight.

Dr. Williams treated Antonakis for at least two years and these three exhibits reflect just a few of many entries documenting complaints and assessments of chronic pain, weakness, fibromyalgia, and migraines. For instance, notes from January 1, 2011, document complaints of migraines, weakness, and pain, Antonakis's hemiparesis (left-sided paralysis) in November 2010 from stroke-like symptoms, and pain from clubbed feet. Dr. Williams's examination revealed left-sided hemiparesis, and "marked tenderness" in the left lumbar area near the vertebrae and "exquisite tenderness" elsewhere. (Tr. 302.) In notes from January 31, 2011, Dr. Williams assessed chronic weakness. (Tr. 298.) Treatment notes from April 14, 2011, show complaints of tingling in Antonakis's left leg and

10

pain in her low back and hips. His observations included diffuse tenderness through Antonakis's hips and lower back and significant decreased sensation in both legs. (Tr. 573.) Additional treatment notes dated June 7, 2011, assessed Antonakis as suffering from fibromyalgia; July 12, 2011, notes reflected a fibromyalgia problem and assessed Antonakis as having chronic pain syndrome. (Tr. 565, 567.) Treatment notes from February 6, 2012, assess Antonakis as having "[m]ental fog with the fibromyalgia"; and notes from February 27, 2012, reference fibromyalgia "with mental cloudiness improved with Ritalin." (Tr. 682, 684.)

Further, the ALJ failed to create a logical bridge concerning some of the evidence he used to discount Dr. Williams's opinions in exhibits 25F, 26F and 34F. Most prominently, the ALJ noted that Exhibit 6F refuted the diagnoses of migraines and fibromyalgia. However, Exhibit 6F shows that the ALJ's conclusion appears to be wrong. Antonakis was referred to the neurologist, Dr. Leone, for evaluation of the cause of her left-sided hemiplegia, not for evaluation of fibromyalgia or whether she suffered migraines. (Tr. 310-12.) Dr. Leone's report appears to be immaterial regarding whether Antonakis has fibromyalgia and he was not asked to look for that condition. Regarding migraines, Dr. Leone wrote on January 17, 2011, that the providers who treated Antonakis on the day of her stroke-like event suspected that the cause was a complex migraine. However, he concluded that the condition "would be unusual for a complex migraine" and thought stroke unlikely; instead, he said the cause of her symptoms was unknown but could have been related to anxiety. (*Id.*) In a February 10, 2011, report Dr. Leone mentioned the results of an MRA test, which was normal, and stated that he did not "have a good etiology for her symptoms at this time. I think a stroke or complex migraine would be very unusual. Some

11

of her symptoms may be related to her anxiety." (Tr. 309.) That Dr. Leone found the stroke-like symptoms were not likely to have been caused by a complex migraine does not logically mean that Antonakis did not suffer migraines. Dr. Leone's opinion does *not* indicate "that he did not believe that she had complex migraines" (Tr. 30), as the ALJ wrote.

The ALJ discounted Exhibit 34F because it was submitted after the hearing and because Dr. Williams's prior treatment records did not show that trigger points were positive for fibromyalgia. But even if no formal trigger-point analysis may be in Antonakis's medical records, numerous treatment notes reflected the problem of fibromyalgia. (*See, e.g.*, Tr. 565, 567, 684.) Antonakis's use of the cane was not suddenly prescribed as the ALJ suggested. (*See* Tr. 30 ("Apparently Dr. Williams has now prescribed a cane and walker for the claimant . . . .").) A physical therapist had recommended use of a cane or four-wheeled walker back in February through April 2011, following the stroke-like event. (Tr. 393, 399, 405, 421.) And Dr. Williams had recommended use of an assistive device in his medical source statement of June 5, 2012. (Tr. 650.) The letter of Exhibit 34F appears to be Antonakis's response to concerns raised by the ALJ at the hearing regarding the fibromyalgia diagnosis and need for a prescription for an assistive device (Tr. 57-58, 76-78) but it does not negate the materials already in the record. In addition, the ALJ points to no substantial evidence in the record supporting his conclusion that Antonakis's need for use of a cane or walker would disappear no later than twelve months after January 2013. (*See* Tr. 30.)

Moreover, even if Dr. Williams's opinions in treatment records were denied controlling weight, the ALJ did not discuss, as he needed to, the factors regarding

12

noncontrolling weight, including length of Antonakis's treatment relationship with Dr. Williams, the frequency of her visits to him, the nature and extent of the treatment relationship, the physician's evidence supporting the opinion (such as Dr. Williams's personal observation or test results from the many doctors to whom he referred Antonakis other than the neurologist), the consistency of the opinion with the record as a whole, or the specialty or generality of the physician. *See* 20 C.F.R. § 404.1527(c)(2)-(6). Thus, the file must be remanded for reconsideration of the treating-physician evidence.

In addition, the ALJ's reliance on the agency medical and mental-health professionals is not supported by substantial evidence because they do not address all of Antonakis's records. Exhibits 11F and 12F are the reports of Drs. George Walcott and Kenneth Clark, who reviewed Antonakis's record. Dr. Walcott provided an RFC assessment on April 7, 2011, that Antonakis could lift ten pounds occasionally, stand at least two hours and sit about six hours in an eight-hour workday, and push and pull without limitations. He found no postural limitations. (Tr. 427-34.) Dr. Clark provided a psychiatric review on April 13, 2011, reporting a non-severe impairment with mild limitations regarding activities of daily living, social functioning, and maintaining concentration, persistence and pace. (Tr. 435-47.) And, notably, exhibits 21F and 22F are one-sentence affirmations of those opinions by other doctors.

On November 1, 2011, Dr. Janis Byrd stated that upon "review of the evidence" Dr. Walcott's assessment form was affirmed as written. (Tr. 632.) Also on November 1, 2011, Dr. Joan Kojis stated that upon "review of the evidence" Dr. Clark's assessment was affirmed as written. (Tr. 631.) Neither Dr. Byrd nor Dr. Kojis stated whether they had reviewed documents from between April 2011 to November 2011 (subsequent to the prior

13

opinions). And all of these opinions preceded medical and psychological records from late 2011 and 2012, as well as records from the April 2012 surgery in which two vertebrae were fused, and Dr Williams's medical source statement (Tr. 650). (*See* Tr. 433 (indicating that no medical source statement was in the file).) Thus, the opinions of Drs. Walcott and Byrd in particular, which include no postural limitations regarding stooping and crouching, must be considered weaker. Yet the ALJ mentioned only that his RFC was more limited than the agency reviewers regarding *mental* functioning. The ALJ did not address the difference in dates between these assessments and the full record before him. For these reasons, remand is required to reevaluate the reviewing-physician opinions as well.

      b. Credibility

In evaluating credibility, the ALJ must comply with SSR 96-7p. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). SSR 96-7p requires consideration of, in addition to medical evidence, (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual has received for the relief of pain or other symptoms; (6) measures, other than treatment, that the individual uses to relieve the pain or other symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms.

In this case, the ALJ, commendably, did not use the troublesome boilerplate criticized by the Seventh Circuit in *Bjornson v. Astrue,* 671 F.3d 640, 644-45 (7th Cir. 2012), and subsequent opinions. He discussed some of Antonakis's testimony, such as

14

her statements that her emotions change rapidly, she has problems with memory and focus, she has difficulty sleeping, she cannot stand long enough to take a shower, her husband and child do most of the cooking, she can help with the dishes for only five to ten minutes, her husband and children do household chores, her husband pays the bills and shops for groceries, she attends church a few times per month, she uses a computer and email for just a few minutes a day, she does crossword puzzles for five to ten minutes, and she does stretching exercises. (Tr. 29.) Also, he noted Antonakis's testimony that she has pain in her low back, left hip, legs, and ankles when she stands; she uses a cane or walker all the time; she uses a brace on her leg; her legs (especially the left) go numb after sitting about ten to twenty minutes; she can lift a gallon of milk from the table but cannot carry anything when she walks; and she helps take care of her sister's baby such as feeding and changing him, but she cannot carry him. (*Id.*) He then concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (*Id.*) Regarding her mental abilities, the ALJ expressed that "[c]rediting the claimant's complaints at least to a degree, [he] limited her to simple routine unskilled work with no more than occasional interaction with supervisors, coworkers and the general public." (Tr. 30.)

However, even though the ALJ did not use the *Bjornson* language, his credibility determination that Antonakis's statements were "not entirely credible" does not describe how or how much Antonakis's statements were credible. He failed to indicate which parts he credited and which parts he did not. And notwithstanding that the ALJ said his

15

determination was based on "the reasons explained in this decision," there was little explanation. Regarding Antonakis's credibility as to medical conditions he said that her "very poor work record" "does not bolster her credibility,"[4] that there is no evidence that her spinal fusion was unstable, that even though she complained of some back pain after the surgery "she was using only Lidoderm and Voltaren for pain control," that she was "highly functional" and felt "dramatically better" in November 2012, and that Dr. Williams thought she had significantly increased functioning by quitting narcotic medication. (Tr. 29.)

However, the ALJ did not discuss Antonakis's daily activities sufficiently; the duration, frequency, and intensity of her pain as reported; the numerous medications Antonakis has taken in attempts to alleviate pain or other symptoms; the reasons she was weaned from narcotics or other medications; and her use of a cane or walker to move around were not explored. The ALJ noted Antonakis's testimony that she cannot stand to do dishes for more than ten minutes and that her leg goes numb after about twenty minutes. But he did not state why he rejected that testimony, which suggests an inability to sit or stand for a full work day, *see* 20 C.F.R. § 416.967(a) (stating that sedentary work involves occasionally carrying articles and occasionally walking and standing), and conflicts with the RFC finding. (The ALJ found that Antonakis could sit for six hours in a day and stand for two hours during an eight-hour workday.) Thus, the ALJ did not sufficiently build a logical bridge in light of his failure to explain which portions of Antonakis's testimony he found exaggerated and why.

---

[4] How a poor work record impacts credibility is unclear—if a person has little prior work because of physical or mental difficulties (or perhaps because of child-care issues), how does that show exaggeration of symptoms?

16

Nor did the ALJ consider Antonakis's complaints of pain stemming from the physical impairments that he rejected, as discussed below in subsection three. The ALJ noted improvement in pain associated with Antonakis's back, but he did not account her complaints of pain related to her hip and clubbed feet. He did not say whether she had continuing problems with left-sided weakness that caused her need for a cane or interfered with her ability to sit or stand. And finally, the ALJ did not mention Antonakis's credibility regarding reports of migraines, which he found were not established by any medical testing but were reported in multiple medical records and experienced by Antonakis weekly, suggesting disability. Thus, the case must be remanded for a fuller credibility determination and reconsideration of Antonakis's RFC in light of the revised credibility determination.

### c. Other RFC Errors

RFC is the most work a claimant can perform in a work setting despite her limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p; *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In determining RFC the ALJ must consider all of the claimant's known, medically determinable impairments—not just the severe impairments. § 404.1545(a)(2), (e); *Stage v. Colvin*, No. 15-1837, ___ F.3d ___, 2016 WL 492333, *4 (7th Cir. Feb. 9, 2016) (stating that the ALJ must evaluate all limitations that arise from medically determinable impairments, "even those that are not severe, and may not dismiss a line of evidence contrary to the ruling" (internal quotation marks omitted)). The ALJ is to consider medical and nonmedical evidence. § 404.1545(e).

Missing from the ALJ's decision is a discussion or a reference to Antonakis's leg weakness or chronic hip and leg pain. (*See, e.g.*, Tr. 258 (documenting "residual partial

17

clubbed feet"), 281 (documenting left-side weakness and decreased sensation the day of her stroke-like incident), 326 (documenting degenerative changes in the left ankle), 388 (physical therapy progress notes documenting "profound weakness and drop foot" in lower left extremity), 405 (documenting continued profound weakness in lower left extremity and balance as "Fair -"), 579 (documenting "definite left footdrop"), 613 (documenting decreased sensation in the feet and weakness in the left foot and hip), 681, 694 (documenting injections in both hips), 695 (documenting significant left hip pain in July 2012 even after injections and back surgery).) Antonakis had problems with her feet and ankles since birth with clubbed feet and several surgeries, which left residual nerve problems. (Tr. 54.) Hip and leg pain and weakness could affect the amount of time Antonakis can stand, sit and carry items.

The ALJ did not consider whether migraines and fibromyalgia, which may not have been diagnosed clinically (according to the ALJ), affected Antonakis in any way that does not constitute a severe impairment. Ongoing headaches could interfere with her ability to concentrate or attend work. And unremarkable test results can be consistent with a migraine diagnosis. Migraine Treatments and drugs—Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/migraine-headache/basics/treatment/con-20026358 (last visited Mar. 22, 2016); *see Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Tyson v. Astrue*, No. 08-cv-383-bbc, 2009 WL 772880, *9 (W.D. Wis. Mar. 20, 2009) ("[I]t appears that no test exists to confirm the diagnosis of migraine."). Here, even if no diagnostic technique resulted in confirmation of headaches, doctors were treating Antonakis with Imitrex, Topamax and Effexor (*see, e.g.*, Tr. 563, 567, 620, 648, 702), all of which appear to be migraine medications, Migraine Treatments and drugs—Mayo Clinic,

18

http://www.mayoclinic.org/diseases-conditions/migraine-headache/basics/treatment/con-20026358 (last visited Mar. 22, 2016), so Antonakis's statements about migraines had some support in the medical records. Also, years of treatment can show that the migraines existed. *See Moon*, 763 F.3d at 721. And when symptoms are documented by a physician in a clinical setting, they are considered medical signs rather than symptoms. *Tyson*, 2009 WL 772880 at *10. Even if Antonakis's migraines alone were not disabling, the ALJ could not ignore them—he had to assess their impact in combination with Antonakis's other impairments. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014).

Additionally, it does not appear that the ALJ fully considered Antonakis's mental condition, some of which is documented in her treatment records and not based on her subjective history alone. For instance, medical records from the spring of 2011 indicate a hospitalization for suicidal thoughts and again for a possible suicide attempt by drug overdose. (Tr. 455, 457, 461, 473-81.) Treatment notes from some providers and a Social Security employee document slow mental responses, at times impaired insight and judgment as well as poor memory. (*See* Tr. 208, 513, 519, 708.) Some medical records (though post-dating the ALJ's hearing) indicate pain syndrome. (Tr. 722, 727.) Behavioral health notes include reports of panic attacks several times per week, even as late as November 2012. (Tr. 656, 715.) And Antonakis and a psychologist (in April 2011) noted that she goes into rages and had difficulty with relationships. (*See* Tr. 62, 359.) The ALJ should have discussed the full range of Antonakis's mental issues, which account for a substantial part of her medical records in this case, even if those mental issues were not severe.

The ALJ was not free to dismiss alleged impairments (whether severe or nonsevere) without explaining why he found evidence inconsequential; meaningful review requires the ALJ to articulate reasons for rejecting an entire line of evidence. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The failure to consider these conditions and to discuss the effects of Antonakis's medications on her ability to work requires remand.

Because the court cannot tell whether in determining RFC the ALJ considered or rejected, the limitations caused by all of Antonakis's impairments and medications, on remand the ALJ must reconsider the RFC determination and step five analysis. The ALJ may wish to take additional testimony pertaining to the details and the limiting effects of Antonakis's migraines, other impairments, and medications. Additional VE testimony likely should be obtained if the RFC determination changes.

## CONCLUSION

For the above-stated reasons,

IT IS ORDERED that the ALJ's decision regarding DIB is affirmed.

IT IS FURTHER ORDERED that the ALJ's decision regarding SSI is reversed regarding RFC and step five as set forth above, but otherwise affirmed.

Dated at Milwaukee, Wisconsin, this 25th day of March, 2016.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE
